UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTT R. RUSHING,

        Plaintiff,

v.                        Case No.  8:07-cv-955-T-33TBM

The estate of ERNEST R.
MINCEY and DAVID LAST,

        Defendants.

_____/

**<u>ORDER</u>**

This matter comes before the Court upon Defendants' Motion for Summary Judgment (Doc. # 30) and Plaintiff's Motion for Summary Judgment (Doc. # 35), both filed on November 6, 2008, and the responses thereto.  Upon due consideration of the submissions and for the reasons stated below, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.

## I.    Background

This case involves the misidentification and arrest of Plaintiff Scott R. Rushing by Defendants Ernest Mincey and David Last, who at the time were acting as officers of the Polk County Sheriff's Office ("PCSO").  The victim of the alleged crime, non-party Richard Wickman, complained to the PCSO that he had been victimized by a local roofer whom he had hired to repair damage to Wickman's roof caused by Hurricane

Charley in 2004. (Doc. # 34, Wickman Depo. at 5-6).
Following an investigation, Plaintiff was arrested on charges
of contracting without a license and grand theft, but the
charges were later dropped when the state attorney's office
("SAO") determined that the wrong person had been arrested.
(Doc. # 35-3, Chastang Depo. at 8-10). The facts leading up
to that arrest are largely undisputed.

On October 21, 2004, Wickman signed a contract hiring
Jeffrey Scott Rushing ("Rushing") to repair damage to his
roof. (Doc. # 31 at 85-86). Throughout his interactions with
Rushing, Wickman knew him only as "Scott Rushing" conducting
business under the name "Roofing by Rushing." Wickman gave
Rushing a check for $2,400 as a deposit for the work. (Id. at
78; Doc. # 34, Wickman Depo. at 7). Wickman later received a
call from Amscot, a check-cashing business, asking him to
verify that he had written a check for $2,400 to a person
named Scott Rushing. (Doc. # 34, Wickman Depo. at 9). The
Amscot representative told Wickman at that time that they had
a copy of Rushing's driver's license. (Id.).

Rushing removed several shingles from Wickman's roof, but
never returned to finish the roofing work. (Doc. # 34,
Wickman Depo. at 7). Wickman placed numerous calls to
Rushing, visited Rushing's home on several occasions, and
spoke with his niece, Sandra Locke, but he was unable to get

Rushing back out to finish the work. On February 3, 2005, Wickman sent Rushing a letter demanding completion of the work by February 13, 2005, or immediate return of Wickman's $2,400 deposit. (Doc. # 31 at 88). After Rushing failed to respond to this letter, Wickman filed a complaint with the PCSO on or about March 1, 2005. (Doc. # 32, Lewis Depo. at 10, 72; # 34 at 47-48).

Wickman's initial report was taken by Linda Lewis, a sheriff's service officer with PCSO. (Doc. # 32, Lewis Depo. at 5-8). The eight-page report included a written statement prepared by Wickman, the contract with Roofing by Rushing, and a copy of the February 3, 2005, letter Wickman sent to Rushing. (Doc. # 32 at 26-33). Both the contract and the letter bore Scott Rushing's address and phone numbers. (Id. at 30). Wickman attests that he also presented a copy of the front and back of the $2,400 check made out to Scott Rushing, bearing Scott Rushing's signature and thumbprint. (Doc. # 34, Wickman Depo. at 19). According to Wickman, at the time he made the initial complaint, a deputy "brought up a driver's license -- picture of Scott Rushing -- from Sarasota" and showed it to Wickman. (Id. at 17-18). Wickman attests that, "The name they brought up, as far as I remember, was Jeffrey Scott Rushing." (Id. at 18).

Deputy Mincey was assigned to investigate Wickman's complaint and on March 11, 2005, Mincey took a recorded statement from Wickman regarding the series of events that led to Wickman's complaint. (Doc. # 34, Wickman Depo. at 7; # 31 at 73-77). At that time, Wickman provided Mincey with a copy of both sides of the $2,400 check that he had obtained from Amscot and told Mincey that Amscot had in its possession a copy of Scott Rushing's driver's license. (Doc. # 34, Wickman Depo. at 24-25; # 31 at 74, 76). Wickman has attested that Mincey showed him a photo-pack line-up of six individuals during this interview. (Id. at 21). Wickman also identified Plaintiff in a second photo pack line-up approximately six months later. (Id. at 25-27).

On or about March 28, 2005, Mincey received a document from the Florida Department of Business and Professional Regulation, indicating that there was no evidence that Scott R. Rushing d/b/a Roofing by Rushing was ever licensed to engage in contracting in the State of Florida. (Doc. # 31 at 81). Mincey completed an arrest affidavit on April 22, 2005, attesting that there was probable cause to issue an arrest warrant for Scott Rushing. (Doc. # 31 at 64, 76-81). The affidavit identified Rushing's address and phone number as those contained on the roofing contract, but listed the

driver's license number and social security number obtained from Plaintiff's driver's license records. (Id. at 64, 83).

On or about May 10, 2005, Mincey obtained a known arrest card bearing the name "Rushing, Scott" from the Carbondale Illinois State Police. (Doc. # 30 at 4; # 33 at 30). Using the fingerprint from this arrest card and the fingerprint from the check that Wickman had produced, Mincey requested a fingerprint comparison from the Identification Section of the Polk County Sheriff's Office on May 10, 2005. (Doc. # 33 at 30-31). Around that same time, Mincey received a memorandum from the State Attorney's office questioning the method of identification of the suspect. (Doc. # 35-3 at 44). Mincey informed the State Attorney's office that fingerprints had been submitted to the ID Section and that the results would be available in "a couple weeks." (Id.). The report of the fingerprint analysis was issued on June 2, 2005, indicating that the fingerprints did not match. (Doc. # 33 at 15, 30).

Mincey went on medical leave from the sheriff's office on June 21, 2005, due to a serious chronic lung condition requiring oxygen. (Doc. # 30-2 at 1-2). A certification from Mincey's doctor indicated that Mincey's "medical condition or need for treatment" commenced on June 3, 2005. (Id.). Mincey thereafter submitted his resignation on September 12, 2005. (Id. at 4).

A capias and information were issued and Plaintiff was arrested on June 25, 2006. (Doc. # 35 at 5). He was subsequently released on bail. (<u>Id.</u>). Plaintiff's attorney investigated the matter, including performing a second fingerprint analysis, and brought the details of that investigation to the attention of the State Attorney's office. (<u>Id.</u>). On September 29, 2006, the State Attorney's office filed a nolle prosequi in its case against Plaintiff. (<u>Id.</u>; Doc. # 35-3 at 40). Detective Mincey passed away sometime between that date and the date that Plaintiff filed his amended complaint.

Plaintiff filed his amended complaint against Detectives Mincey and Last on December 3, 2007, asserting violations of his civil rights under 42 U.S.C. § 1983 arising from his false arrest. The parties then filed their cross-motions for summary judgment on November 6, 2008.

## II. **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute alone is not enough to

defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

Section 1983 imposes civil liability on any person who, under color of state law, "subjects, or causes to be subjected" a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Plaintiff alleges that Defendants violated his Fourth Amendment right to be free from

unreasonable search and seizure by arresting him without probable cause. Defendants claim that their conduct did not "constitute the type of abuse of government power that is cognizable under Section 1983" and that they are shielded from liability by the doctrine of qualified immunity. (Doc. # 30 at 1).

"Qualified immunity protects government officials performing discretionary functions as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[1] <u>Sharp v. Fisher</u>, 532 F.3d 1180, 1183 (11th Cir. 2008) (quoting <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007)). Qualified immunity relieves government officials from the need to "constantly err on the side of caution" by protecting them from liability and the burdens of litigation. <u>Holmes v. Kucynda</u>, 321 F.3d 1069, 1077 (11th Cir. 2003) (citations omitted). However, "it does not offer protection 'if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'"

---

[1]Plaintiff does not dispute that defendants were government officials performing discretionary functions. Accordingly, the only issue before the Court is whether plaintiff can show that Defendants violated a clearly established constitutional right of which a reasonable person would have known.

<u>Id.</u> (quoting <u>Lambert v. Fulton County</u>, 253 F.3d 588, 596 (11th Cir. 2001)).

"It is well established that a plaintiff seeking to overcome the defendant's privilege of qualified immunity must show (1) that the officer violated her federal constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted." <u>Douglas Asphalt Co. v. Qore, Inc.</u>, 541 F.3d 1269, 1273 (11th Cir. 2008). The threshold question is whether the facts alleged, taken in the light most favorable to the plaintiff, establish a constitutional violation at all. <u>Holmes</u>, 321 F.3d at 1077. If no constitutional violation is established, then no further inquiries regarding qualified immunity are needed. <u>Id.</u> If, on the other hand, the facts establish a constitutional violation, then the plaintiff must further show that the right was "clearly established." <u>Id.</u> (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).

"For a constitutional right to be clearly established, the contours of that right 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Id.</u> (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). It is not necessary that the facts in prior cases be fundamentally similar or even materially similar to the facts alleged; it is sufficient if pre-existing

law gives the official "fair warning that their alleged [conduct is] unconstitutional." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

In the context of probable cause to seek an arrest warrant, an officer is protected by qualified immunity if there is "arguable probable cause for the arrest." <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1232 (11th Cir. 2004). The Court is to apply an objective standard to determine whether any officer could have found probable cause under the totality of the circumstances. <u>Id.</u> It is established that arguable probable cause, not actual probable cause, is the standard that governs the qualified immunity inquiry. <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283 n. 3 (11th Cir. 1999) (citing <u>Gold v. City of Miami</u>, 121 F.3d 1442, 1445 (11th Cir. 1997)). What is important for qualified immunity purposes is "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." <u>Id.</u> (citing <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)).

**A. Detective Mincey**

Plaintiff argues that Detective Mincey lacked probable cause to seek Plaintiff's arrest because Mincey possessed knowledge that raised "considerable doubts about Plaintiff's

identity" and Mincey failed to reasonably investigate these doubts even though he had several months to do so. (Doc. # 35 at 10). Wickman provided Mincey with Rushing's address and phone numbers, the phone number of his niece, and a copy of the cancelled check with Rushing's signature and fingerprint. Because Mincey failed to explore any of these avenues for verification of Rushing's identity, Plaintiff argues that Mincey did not act reasonably in asserting probable cause to obtain an arrest warrant. Additionally, it is alleged that Mincey intentionally or recklessly ignored a fingerprint report in his possession that conclusively proved that Plaintiff was not the perpetrator of the crime against Wickman. Plaintiff asserts that no reasonable officer in the same circumstances would believe that probable cause existed to arrest Plaintiff.

Plaintiff cites to <u>Tillman v. Coley</u>, in which the Eleventh Circuit affirmed a decision denying qualified immunity to a sheriff who obtained an arrest warrant for the wrong person. 886 F.2d 317, 320 (11th Cir. 1989). In that case, an undercover agent filed a written report which stated that he had made a drug sale to a woman named "Mary Tilma" and included a physical description of the suspect. <u>Id.</u> at 318. Based on this report, the sheriff, who had lived in the county all of his life and had been sheriff there for twelve years,

filled out an affidavit to obtain an arrest warrant for the only woman he knew named Mary Tillman (Mary Tilma), who happened to live in close proximity to the location of the undercover sale. Id.

The sheriff knew when he completed the affidavit that the age of the Mary Tillman he knew (41) did not match the undercover officer's description of the perpetrator as being "about 24." Id. Although the warrant was sought three months after the agent's report was received and the sheriff admitted he had doubts about the identity of the suspect during this period, he made no effort to determine whether the Mary Tillman he knew was the same woman identified by the undercover agent. Id. In addition, the sheriff did not inform the magistrate of his doubts concerning the age discrepancy. Id. The sheriff later indicated that he had sought Mary Tillman's arrest in spite of his doubts in order to identify her and eliminate her as a suspect. Id.

The district court denied the sheriff's claim of qualified immunity, holding that "'no reasonably competent law enforcement officer would have concluded that a warrant should have issued for the arrest of the plaintiff, Mary Lois Tillman,' especially when the officer had personal knowledge of Tillman and of the age discrepancy." Id. at 319 (citing the district court opinion). Following a de novo review of

the district court's denial of summary judgment based on qualified immunity, the Eleventh Circuit upheld the decision, stating that "while the absence of probable cause will not always defeat a qualified immunity defense, no reasonable law enforcement officer may conclude that an arrest warrant may be obtained and an arrest made for the sole purpose of identifying a suspect." <u>Id.</u> at 321.

The current circumstances are notably different and do not rise to the level of recklessness exhibited by the defendant in <u>Tillman</u>. The sheriff in that case admitted to knowledge of a significant discrepancy in the description of the suspect, that he had doubts regarding the suspect's identity, and that he nevertheless caused the arrest of the plaintiff to resolve those doubts. Here, there is no proof that Mincey had doubts as to Rushing's identity when he completed the affidavit to obtain a warrant, or that he sought arrest to confirm that Rushing was indeed the perpetrator of the crime.

Because Mincey cannot testify to his state of mind at the time of the investigation, the Court is left to speculate as to the knowledge that Mincey actually possessed at the time that he sought the arrest warrant concerning Plaintiff. The evidence shows that, following Wickman's complaint, Mincey did take appropriate steps to investigate the claim by

interviewing Wickman and sending out for a fingerprint report regarding the prints on the back of the check produced by Wickman. Mincey also sought and received evidence that Scott Rushing d/b/a Roofing by Rushing was not licensed as a contractor with the State of Florida. Further, Mincey obtained arrest records for a Scott Rushing from the Indiana state police. (Doc. # 33 at 30). Most importantly, Mincey had Wickman identify plaintiff from a photo line-up as the person who contracted to repair his roof.

Plaintiff relies primarily on two Eleventh Circuit cases concerning the application of qualified immunity to police officers accused of filing arrest affidavits without probable cause. (Doc. # 35 at 10-11). In <u>Holmes v. Kucynda</u>, the court held that the defendant police officer was not entitled to qualified immunity because "the facts support[ed] a conclusion that [the defendant's] warrant application included deliberately false statements about the incidents leading to Holmes' arrest." 321 F.3d at 1083. In <u>Kingsland v. City of Miami</u>, the plaintiff asserted that police officers "made several deliberately false statements to support her arrest, in violation of the law." 382 F.3d at 1233. The Eleventh Circuit reversed the district court's holding that the defendants were entitled to qualified immunity, finding that " a jury question exists as to whether the defendants

constructed evidence upon which to base Kingsland's arrest."
Id.

The Kingsland court noted that, while an officer is not
required to investigate "every theoretically plausible claim
of innocence," the officer may not choose to ignore offered
information or conduct an investigation in a biased way by
electing not to obtain easily discoverable facts.   Id. at
1229.   The Eleventh Circuit thus denied qualified immunity
where the defendants' misconduct was knowing or purposeful, as
illustrated by the court's references to "deliberately false
statements, "constructed evidence," and "electing not to
obtain easily discoverable facts."   In this case, Plaintiff
has presented no evidence that Mincey's actions in failing to
pursue certain leads was purposeful or that Mincey's intent
was to conduct a biased investigation.

Mincey's statements on the arrest affidavit were not
false.   Although the arrest application identified the
perpetrator as Scott Rushing instead of J. Scott Rushing (or
Jeffrey Scott Rushing), Wickman admits that he issued his
complaint against Scott Rushing and that Wickman believed
throughout the investigation that the perpetrator's name was
Scott Rushing.   Mincey completed the affidavit using the
address and phone numbers on the roofing contract and the
driver's license number and social security number of the man

that Wickman had previously identified as the perpetrator. (Doc. # 34, Wickman Depo. at 21-23). Mincey was not in possession of the fingerprint analysis when he completed the affidavit.

Plaintiff has offered evidence that the State Attorney's office sent a memorandum to Mincey on or about May 6, 2005, requesting further proof of the suspect's identity prior to their making a filing decision regarding the arrest warrant. (Doc. # 35-3 at 44). Mincey wrote at the bottom of the memorandum that "[t]he prints are in the I.D. Section -- I will have a print I.D. in a couple of weeks. (Id.)

Although the fingerprint report was completed on June 2, 2005, there is no evidence establishing the precise date that it was received by Mincey. (Doc. # 33, Newman Depo. at 15) (stating that the information was sent to Mincey "around June 2nd"). The record is devoid of any evidence regarding Mincey's actual receipt of the fingerprint report or his actions thereafter. Mincey cannot be deposed regarding his actions or intentions during this period. The uncertainty surrounding Mincey's handling of the fingerprint report is further complicated by the fact that Mincey was apparently seriously ill during that time period.

Mincey went on medical leave on June 21, 2005, and the Certification of Health Care Provider submitted by Mincey

reflected that he was suffering from "severe underlying lung disease requiring oxygen" (emphysema) that commenced on June 3, 2005. (Doc. # 30-2 at 1-2). No evidence has been presented regarding absences by Mincey after the onset of his illness, although it is reasonable to assume that his serious health problems affected his ability to perform his job. The extent of Mincey's work activity, if any, between the date he began leave and the date that he resigned on August 26, 2005, is also unknown. (<u>Id.</u> at 4).

Based on these facts, Plaintiff has not met his burden in showing that no "reasonable officer in the same circumstances and possessing the same knowledge as [Mincey] could have believed that probable cause existed to arrest Plaintiff." <u>Von Stein v. Brescher</u>, 904 F.2d 572, 579 (11th Cir. 1990). Mincey conducted an investigation regarding Wickman's complaint, sought proof of Rushing's licensing with the State, and procured a photo-pack identification of Plaintiff from Wickman. Although it is apparent that Mincey did not fully explore all of the information at his disposal, the Court does not find that Mincey purposely ignored exculpatory evidence, created false evidence, or acted in reckless disregard of the truth of his assertions on the arrest affidavit. Accordingly, Mincey is entitled to qualified immunity on Plaintiff's § 1983 claim against him.

**B.    Detective Last**

Plaintiff argues that Detective Last is not entitled to qualified immunity because he failed to act reasonably under the circumstances when he neglected to read the entire nineteen-page file before conducting the photo-pack lineup. (Doc. # 35 at 12).  Plaintiff asserts that Last intentionally or recklessly failed to read the fingerprint analysis contained in the file, which "conclusively proved Plaintiff's innocence," even though the assistant state attorney expressed doubts about the identity of the suspect.  (Id. at 11-12).

The Court finds no evidence to support Plaintiff's assertion that the state attorney expressed such doubts to Last.  Plaintiff identifies Assistant State Attorney Graylin Chastang as the person who contacted Last and "expressed doubts about the validity of the identity of the Plaintiff." (Doc. # 35 at 4).  However, Chastang did not become involved in the case until July 2006, one month after Plaintiff was arrested.  (Doc. # 35-2, Chastang Depo. at 8).  In addition, Plaintiff's citation to the record does not support this assertion.   The portion of Last's deposition cited by Plaintiff contains testimony by Last to the effect that someone in the State Attorney's office contacted him and asked

him to do a photo pack line-up with Wickman. (Doc. # 35 at 4 n. 18; # 35-2 at 10).

According to Last, the State Attorney's office contacted him in January 2006 and told him that the investigation had been completed, that there was already a charge based on the affidavit, and that all they needed was a photo-pack identification from the victim. (Doc. # 31, Last Depot. at 10, 26, 37). Following this request, Last ordered the file, pulled Plaintiff's driver's license from the arrest affidavit, and assembled the photo pack. (<u>Id.</u> at 14). When asked at his deposition why he would not have looked through the file, Last responded, "Unless they told me to there wouldn't be a reason to review it. The investigation according to the State Attorney's office was complete. There was a charge already done. They just didn't have an identification, so they asked for an identification. That's all I did." (<u>Id.</u> at 26).

The Court finds that Last's failure to review Plaintiff's file and alert the State Attorney's office to the fingerprint report is not sufficient grounds to deny Last qualified immunity for his minor participation in the case. The record does not support a finding that Last acted unreasonably under the circumstances. He conducted a photo pack line-up, at the request of the State Attorney's office, for a case in which he was not previously involved. Plaintiff has shown no reason

for Last to have questioned the thoroughness of the previous investigation or the State Attorney's familiarity with the case file.

Last has testified that, even had he known about the fingerprint report, he would have done nothing differently. "The State Attorney's office already had that information. They asked me specifically with that information to get an ID . . . . I wouldn't second guess them and tell them, well, this information is attached to the report." (Id. at 37). Last was given no indication that there had been any problems in the identification of Plaintiff. (Id. at 29-30, 37-38).

The record also shows that under the circumstances known to Last, there was no reason for him to believe that Wickman's identification of Plaintiff was unreliable. Wickman did testify that the photograph of Plaintiff that Last included in the photo pack on January 20, 2006, was the same photograph that had been shown to Wickman on the day that he filed his complaint. (Doc. # 35-3, Wickman Depo. at 17-18). Based on this evidence, Plaintiff infers that Last was aware that Wickman had previously seen the photograph and therefore Last should have known that the identification was unreliable. (Doc. # 35 at 5). Last's deposition testimony contradicts this implication, however, as Last has stated that he did not

know that Wickman had ever seen the photograph of the Plaintiff before. (Doc. # 31, Last Depo. at 33, 39).

Furthermore, Last completed a report on January 20, 2006, that states,

> I advised him to carefully – meaning Wickman – to look over all of the photos and only make a selection if he is sure the subject who committed the offense is the subject in the photo. I advised the victim that we'd rather a guilty man to walk than arresting an innocent person.

(Id. at 31). Last testified at his deposition that for his whole career he has made that statement to any individual who participates in a photo pack identification. (Id. at 32-33). The evidence clearly shows that Wickman was cautioned not to identify someone as the perpetrator unless he was absolutely sure that it was the person who had committed the crime.

Viewed in the light most favorable to Plaintiff, the record as a whole shows that Last behaved in an objectively reasonable fashion in securing Wickman's identification of Plaintiff. For the foregoing reasons, the Court holds that Last is entitled to qualified immunity on Plaintiff's § 1983 claim against him. The Court therefore grants Defendants' motion for summary judgment.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants' Motion for Summary Judgment (Doc. # 30) is **GRANTED**.

(2) Plaintiff's Motion for Summary Judgment (Doc. # 35) is **DENIED.**

(3) The Clerk is directed to enter final judgment in behalf of Defendants and against Plaintiff.  The Clerk is further directed to terminate any pending motions and close the file.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>19th</u> day of April 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:   All Parties of Record